UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

HENRY FRANKHAUSER,
                                                                        **DECISION**
                                                                              **and**
                                        Plaintiff,                      **ORDER**

            v.
                                                                   **02-CV-256F**

JoANNE B. BARNHART, Commissioner of
 Social Security,                                              **(consent)**

                                        Defendant.
_____

APPEARANCES:          ALBERT V. LOWMAN, Jr., Esq.
                                    Erie County Department of Social Services
                                      Office of Counsel
                                    Attorney for Plaintiff
                                    43 Court Street, 4th Floor
                                    Buffalo, New York 14202

                                    KATHLEEN M. MEHLTRETTER
                                    Acting United States Attorney
                                    Attorney for Defendant
                                    JANE B. WOLFE
                                    Assistant United States Attorney, of Counsel
                                    Federal Centre
                                    138 Delaware Avenue
                                    Buffalo, New York 14202

## JURISDICTION

        The parties to this action consented to proceed before the undersigned on July

2, 2003.  The matter is presently before the court on Defendant's motion for judgment

on the pleadings (Doc. No. 11), filed July 1, 2003, and on Plaintiff's cross-motion for

judgment on the pleadings (Doc. No. 14), filed on August 4, 2003.

## PROCEDURAL HISTORY

Plaintiff filed applications for Social Security Disability Benefits ("SSDI") under Title II of the Social Security Act ("the Act"), and Supplemental Security Insurance ("SSI") under Title XVI of the Act (together, "disability benefits"), on September 14, 1995, alleging he was disabled since September 30, 1992, by alcohol and drug abuse and depression.  (R. 136-38 (SSDI), 139-40 (SSI)).[1]  The applications were initially denied on February 12, 1996 (R. 142-50), and, upon reconsideration, on February 24, 1996 (R. 154).  Pursuant to Plaintiff's request filed April 12, 1996 (R. 179-80).  An administrative hearing was held on May 11, 1997, before Administrative Law Judge ("ALJ") Bruce Mazzarella ("the ALJ"), at which time Plaintiff, represented by Erie County Office of Counsel Supervising Paralegal Kathleen Traina ("Traina"), appeared and testified.  (R. 40-71).  On September 15, 1997, the ALJ found Plaintiff was not disabled.  (R. 325-40).  Specifically, the ALJ determined that Plaintiff's substance abuse disorder was severe and would meet the criteria necessary to establish disability as defined under the Act.  (R. 328).  The ALJ, however, further determined that absent Plaintiff's alcohol and drug abuse, Plaintiff would be able to perform his past relevant work of an unskilled, repetitive nature and, as such, Plaintiff, by operation of recently enacted statutes including 42 U.S.C. §§ 423(d)(2)(C) and 1382c(a)(3)(J), could not be considered disabled.  (R. 328).

On October 16, 1997, Plaintiff requested review of the hearing decision by the Appeals Council.  (R. 343-46).  Upon considering Plaintiff's request for review of the

---

[1] "R." references are to the page numbers of the administrative record submitted in this case for the court's review.

ALJ's hearing decision and the record, the Appeals Council, on September 23, 1999, granted Plaintiff's request for review, vacated the ALJ's decision and remanded the matter to the ALJ for a new hearing and decision and specifically instructed that additional information from a medical expert was needed to determine the nature and severity of limitations arising from Plaintiff's personality and bipolar disorders which would remain absent Plaintiff's drug and alcohol abuse.  (R. 347-49).

At the second administrative hearing, held on November 9, 2000, before ALJ Mazzarella, Plaintiff, again represented by Kathleen Traina, appeared and testified. Psychiatrist Nelli Mitchell, M.D. ("Dr. Mitchell") appeared as a medical expert and testified as to the nature, severity and limitations arising from Plaintiff's personality and bipolar disorders.  (R. 72-135).  On December 8, 2000, ALJ Mazzarella again found Plaintiff was not disabled.  (R. 10-37).  On December 15, 2000, Plaintiff requested review of the hearing decision by the Appeals Council.  (R. 6-9).  Upon considering Plaintiff's request for review of the ALJ's hearing decision and the record, the Appeals Council, on March 15, 2002, found no basis for granting the review and denied the request, thereby rendering the ALJ's hearing decision the final decision of the Commissioner.  (R. 4-5).  This action seeking review of the Commissioner's decision denying Plaintiff disability benefits followed on April 3, 2002.

The Commissioner's answer to the Complaint, filed on March 27, 2003 (Doc. No. 7), was accompanied by the attached record of the administrative proceedings.[2]  On

---

[2] By Stipulation and Order filed on July 17, 2002 (Doc. No. 6), the matter was remanded to the Commissioner for further administrative proceedings pursuant to the sixth sentence of 42 U.S.C. § 405(g) as Plaintiff's claim file and hearing tape could not be located.  It was further ordered that if Defendant could not expeditiously obtain Plaintiff's claim file and hearing tape, efforts would be undertaken to reconstruct the file and a new hearing would be held.  The answer and administrative record were filed

July 1, 2003, the Commissioner filed a motion for judgment on the pleadings, and a Memorandum of Law in Support of the Commissioner's Motion for Judgment on the Pleadings (Doc. No. 12) ("Commissioner's Memorandum").  On August 4, 2003, Plaintiff filed a cross-motion for judgment on the pleadings, attached to which is a Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings.  ("Plaintiff's Memorandum").  On September 4, 2003, the Commissioner filed, in further support of her motion for judgment on the pleadings and in opposition to Plaintiff's cross-motion for judgment on the pleadings, The Commissioner's Reply Memorandum of Law (Doc. No. 16) ("Commissioner's Reply").  Oral argument was deemed unnecessary.

Based on the following, Defendant's motion for judgment on the pleadings (Doc. No. 11) is DENIED; Plaintiff's cross-motion for judgment on the pleadings (Doc. No. 14) is GRANTED, and the matter is remanded for calculation and payment of benefits.

### FACTS[3]

Plaintiff Henry Frankhauser ("Plaintiff"), who was born on March 24, 1961, (R. 45, 77), completed the 8th grade, dropped out of school in the 9th grade, obtained a GED in 1984 and attended Bryant and Stratton for a while but eventually dropped out. (R. 82, 251).  Plaintiff who is divorced and has three children from his marriage, has worked in the past as a car detailer at a car wash, a building maintenance worker and a cook/cleaner in a restaurant.  (R. 184-89).

---

after Plaintiff's claim file and hearing tape were located.

[3] Taken from the pleadings, administrative record, and motion papers filed in this action.

It is undisputed that Plaintiff has a history of polysubstance abuse, primarily alcohol, marijuana and glue sniffing, for which he has sought and obtained treatment on numerous occasions from various sources.  Plaintiff began abusing alcohol at age 11 and by age 15 was regularly sniffing glue and smoking marijuana.  (R. 89-91, 285-86).  Plaintiff testified at the time of the second administrative hearing on November 9, 2000, that he had not used drugs or alcohol for six months.  (R. 89).

Also undisputed is that Plaintiff suffers from a personality disorder and a bipolar disorder which has been treated with prescription medication, including Lithium Carbonate (antipsychotic, antimanic medication for bipolar disorder), Trilafon (for management of psychotic disorders including agitated depression and schizophrenia), Paxil (psychotropic drug used to treat major depressive disorder, social anxiety disorder,  panic disorder and generalized anxiety disorder), Haldol (schizophrenia medication), Cogentin (used to improve movement side effects of antipsychotic drugs), Ativan (anxiety relief medication) and Depakote (used to treat mania associated with bipolar disorder).  (R. 262-64, 283-84).  Plaintiff's compliance with his prescription medication, however, has been sporadic.

On October 4, 1996, Plaintiff was admitted to Buffalo Psychiatric Center ("the Psych Center"), where Plaintiff was treated by L.B. Tjoa, M.D. ("Dr. Tjoa"), who diagnosed Bipolar I Disorder Manic, History of Polysubstance Abuse and History of Antisocial Personality.  (R. 261-68).  Upon examination, Plaintiff was irritable, overproductive, had irrelevant speech, inflated self esteem, disorganized thinking, loosely associated, grandiose, inappropriate behavior, and labile mood.  (R. 263).

Plaintiff's GAF[4] score was 20|30.  (R. 263).  Plaintiff was treated with Lithium Carbonate

for his labile mood, Trilafon for his delusions, and Paxil for depression and improved

within a week.  (R. 263).  Plaintiff was advised to take his medication and cease

drinking alcohol.  (R. 263).  Upon his discharge on November 8, 1996, Plaintiff's

condition was described as friendly, not irritable, not angry, his speech was relevant

and not overproductive, thinking was not disorganized, Plaintiff had no delusions, his

judgment was better, self esteem was not inflated, and Plaintiff was not suicidal,

depressed nor homicidal.  (R. 264).  Plaintiff's discharge diagnosis included Bipolar I

Disorder, Recent Manic Episode, and his GAF score upon discharge was 5|10,

indicating Dr. Tjoa had inadequate information to report on Plaintiff's overall level of

functioning and carrying out activities of daily living.  (R. 264).

On February 5, 1997, Dr. Tjoa completed a form relating to Plaintiff's ability to do

work-related activities on a day-to-day basis in a regular work setting.  (R. 258-60).  Dr.

Tjoa indicated Plaintiff had poor to no ability to follow work rules, deal with the public,

interact with supervisors, and deal with work stresses, fair ability to relate to co-workers,

use judgment and to maintain attention/concentration, and good ability to function

independently.  (R. 258).  Plaintiff's ability to understand, remember and carry out

complex or detailed, but not complex job instructions was poor to none, and his ability

---

[4] The Global Assessment of Functioning ("GAF") Scale is a rating for reporting the clinician's judgment of the patient's overall level of functioning and carrying out activities of daily living.  The GAF score is measured on a scale of 0 - 100, with a higher number associated with higher functioning.  A GAF score of 20 to 30 indicates "[b]ehavior is considerably influenced by delusions or hallucinations or serious impairment in communications or judgment (*e.g.*, sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) or an inability to functions in all areas (*e.g.*, stays in bed all day, no job, home, or friends)."  DSM-IV: Axis V, Global Assessment of Functioning, *available at* http://www.hopeallianz.com/Resources/MI6.html.

to understand, remember and carry out simple job instructions was fair. (R. 259).

Plaintiff had poor to no ability to behave in an emotionally stable manner, relate

predictably in social situation, and to demonstrate reliability, and Plaintiff's ability to

maintain his personal appearance was fair.  (R. 259).  Dr. Tjoa further commented that

Plaintiff has a history of hospitalizations for sever depression and manic behavior since

1992, and that when decompensated, Plaintiff suffers from paranoid ideation and

emotional lability that interferes with Plaintiff's ability to interact with others.  (R. 259).

Plaintiff also has a short attention span, limited ability to focus on the task at hand, and

poor impulse control.  (R. 260).

Plaintiff, on November 18, 1996, was arrested by the Buffalo Police Department

for reckless driving and taken to Erie County Medical Center ("ECMC") where Plainitff

was admitted on emergency status.  (R. 283-84).  Plaintiff's admitting diagnosis was

bipolar disorder, manic phase.  (R. 283-84).  Upon initial mental status examination by

the attending physician, Hak Ko, M.D. ("Dr. Ko"), Plaintiff was

> extremely labile, irritable, angry, hostile, agitated and delusional, saying that he
> saw a sign on the wall that says that his 12 year old daughter was a crack addict
> and that's why he was driving around the street, 'to keep her from evil.'  He was
> grossly delusional and manic and apparently has not been complying with his
> medications.  There is a question about whether he was also abusing alcohol
> prior to his admission.

(R. 283).

Plaintiff was treated with Haldol, Lithium, Cogentin, and Ativan for his marked agitation

and Plaintiff had to be restrained on two occasions during the first two days of his

admission.  (R. 283).  Plaintiff showed a "fairly rapid improvement" with the medications

and was willing to cooperate with follow up treatment, including Lithium and Depakote.

7

(R. 283).  Upon discharge, Plaintiff was markedly improved, his behavior was in good control and his was in no physical distress.  (R. 284).

Plaintiff was involuntarily hospitalized for psychiatric treatment from November 15 through November 23, 1999 at Kaleida Health Center.  (R. 366).  Plaintiff's counselor at Mid-Erie Counseling and Treatment Services ("Mid-Erie") Elaine Frank ("Frank"), reported that at the time of such hospitalization, Plaintiff appeared to be non-compliant with his prescribed medications, and that his decompensation was initiated by the break-up of a personal relationship.  (R. 366).

On November 15, 1999, Plaintiff's treating psychiatrist at Mid-Erie, Dr. Kung,[5] who had treated Plaintiff since July 22, 1999, completed a questionnaire regarding Plaintiff's ability to do work-related activities on a daily basis in a regular work setting. (R. 367-69 and 370).  Dr. Kung reported Plaintiff had only a fair ability to follow work rules, relate to co-workers, deal with the public, use judgment, interact with supervisors, deal with work stresses, function independently and maintain attention and concentration.  (R. 367).  Dr. Kung commented that Plaintiff "appears to be manic," is easily agitated, and has great difficulty focusing or concentrating on task.  (R. 367). According to Dr. Kung, Plaintiff only had a fair ability to understand, remember and carry out simple, detailed but not complex and complex job instructions.  (R. 368).  Dr. Kung noted Plaintiff's manic disorder, his thought organization and concentration were impaired, memory was intact, but comprehension was difficult to assess.  (R. 368). Plaintiff had only a fair ability to maintain his personal appearance and to demonstrate

---

[5] The court notes that Dr. Kung, whose first name is not found in the record, is erroneously referred to as "Dr. King" by the ALJ.  *See e.g.*, R. 16 and 17.

reliability, and poor to no ability to behave in an emotionally stable manner or to relate predictably in social situations.  (R. 368).  Dr. Kung commented that Plaintiff appears agitated at times, is argumentative and challenging and reacts unpredictably in social or group settings.  (R. 368).  According to Dr. Kung, Plaintiff was not able to manage benefits in his own best interest.  (R. 369).

On a Psychiatric Medical Report prepared by Dr. Kung on November 15, 1999, Plaintiff's diagnosis was listed as bipolar disorder manic and alcohol abuse.  (R. 370-73).  At Plaintiff's most recent mental status examination on October 25, 1999, Plaintiff was manic and somewhat agitated, his appearance was fair, his speech was clear and coherent, Plaintiff reported hearing voices telling him "bad things," although Plaintiff was coherent and relevant and without overt delusions, Plaintiff showed average intelligence, some insight, limited judgment and was advised to quit drinking.  (R. 371).  Dr. Kung explained that when Plaintiff is decompensated, he has "great difficulty" relating to staff and others, was argumentative, challenging and threatening in his behavior, and has very poor insight into his negative behavior.  (R. 372).  Dr. Kung further stated that when Plaintiff takes his prescribed medications and follows through with his treatments "he can be stable psychiatrically."  (R. 373).  As to Plaintiff's ability to engage in sustained work activity, Dr. Kung wrote that "at this time [Plaintiff] does not appear to be able to engage in sustained work activity due to his Bipolar [disorder]."  (R. 373).

On a Mental residual Functional Capacity Assessment completed on November 15, 1999, Dr. Kung reported there was no evidence of any limitation as to Plaintiff's understanding and memory, and ability to carry out very short, simple instructions,

Plaintiff was not significantly limited as to making simple work-related decisions, was

moderately limited as to maintaining attention and concentration for extended periods,

sustaining an ordinary routine without special supervision, working in coordination with

or proximity to others without being distracted by them, and completing a normal

workday and workweek without interruptions from psychologically based symptoms and

performing at a consistent pace without an unreasonable number and length of rest

periods, and markedly limited as to performing activities within a schedule, maintaining

regular attendance, and being punctual within customary tolerances.  (R. 374-75).  With

regard to the category of social interaction, Plaintiff was not significantly limited as to

asking simple questions or requesting assistance, was moderately limited as to getting

along with co-workers or peers without distracting them or exhibiting behavioral

extremes, and maintaining socially appropriate behavior and adhering to basic

standards of neatness and cleanliness, and was markedly limited as to interacting

appropriately with the general public and accepting instructions and responding

appropriately to criticism from supervisors.  (R. 375).  As to the adaptation category,

Plaintiff was not significantly limited as to responding appropriately to changes in the

work setting, traveling in unfamiliar places or using public transportation, but was

markedly limited as to being aware of normal hazards and taking appropriate

precautions.  (R. 375).

On November 23, 1999, Plaintiff's counselor at Mid-Erie, Elaine Frank ("Frank"),

completed a questionnaire regarding Plaintiff's ability to do work-related activities on a

daily basis in a regular work setting.  (R. 364-66).  Frank reported that Plaintiff's

significant fluctuations in his stability made it difficult to assess his ability to make

occupational adjustments.  (R. 364).  According to Frank, when Plaintiff "is compliant, he is able to perform simple tasks with little to no staff intervention.  However, when [Plaintiff] is in a manic phase of his illness, he is argumentive [*sic*], verbally abusive, defies authority and uncooperative."  (R. 364).  Frank continued that Plaintiff has "significant difficulties coping with stress.  The majority of his decompensations are precipitated by alcohol and substance abuse."  (R. 364).  Frank rated Plaintiff's ability to understand, remember and carry out simple, detailed but not complex, and complex job instructions as "fair," explaining that Plaintiff is unable to admit to his shortcomings, cannot negotiate with authority figures and is unable to accept criticism from others.  (R. 365).  Frank continued that in addition to an unwillingness to admit when he did not know how to do something, Plainitff also failed to ask questions when he was unsure of himself.  (R. 365).  Frank rated Plaintiff's ability to maintain personal appearance, related predictably in social situations and to demonstrate reliability as "fair," and to behave in an emotionally stable manner as "poor or none."  (R. 365).

According to Frank, such abilities depended on Plaintiff's stability, explaining that Plaintiff can be congenial and sociable, but when unstable, could be argumentative, uncooperative and verbally abusive, and that Plaintiff "roams from one clinician to another throughout the building seeking attention and causing conflict."  (R. 365).  As to Plaintiff's ability to perform other work-related activities, Frank reported that Plaintiff, as part of his treatment program, is expected to volunteer weekly for two hours, but often complains that even simple tasks are too demanding and that he is expected to do too much.  (R. 366).  Frank reported Plaintiff was unable to manage benefits in his own interest.  (R. 366).  Frank additionally noted Plaintiff's involuntary hospitalization for

psychotic treatment at ECMC on November 11, 1999, commenting it was her belief that Plaintiff "was not compliant with his medication regime prior to this hospitalization." (R. 366). According to Frank, Plaintiff's "coping skills are very poor and he lacks interpersonal skills. This most recent decompensation was initiate by the break-up of a personal relationship." (R. 366).

In a Psychiatric Medical Report prepared on September 11, 2000, Dr. Kung described Plaintiff as "generally cooperative" and compliant, that Plaintiff attended his substance abuse program three times a week, was not agitated or acting out, was coherent and relevant, without thought disorders and mood appeared stable although Plaintiff had limited insight and judgment. (R. 408, 410-11). Plaintiff's prognosis was guarded and his ability to engage in work was "limited" by Plaintiff's limited insight and judgment. (R. 412). Dr. Kung further noted Plaintiff reported having audible hallucinations on a daily basis. (R. 412). Dr. Kung further stated he was unable "to disentangle the restrictions and limitations imposed by the patient's history of alcohol/substance abuse from those resulting from his other impairments." (R. 413).

On a questionnaire regarding Plaintiff's ability to do work-related activities on a day-to-day basis in a regular work setting, Mike Baker ("Baker"), another counselor at Mid-Erie, reported Plaintiff's abilities to make occupational work adjustments were "fair," his abilities to understand, remember and carry out job instructions were "good" as to simple job instructions, but "fair" as to detailed, but not complex, and complex instructions, and his abilities to make social adjustments were "fair." (R. 418-19). Baker further remarked that Plaintiff "appears to be at baseline psychiatrically" and claimed to be taking his medication. (R. 420). Plaintiff also claimed to have

hallucinations on a daily basis, but denied having "command hallucinations," suicidal or homicidal ideation, and that Plaintiff was unable to manage benefits in his own best interest.  (R. 420).

At the second administrative hearing held on November 9, 2000, testimony was taken first from Plaintiff and then from Dr. Mitchell who testified as a medical expert. (R. 72-135).  Plaintiff testified that Dr. Tjoa was his treating psychiatrist since shortly after October 1996, when Plaintiff's bipolar disorder was initially diagnosed, until 1999 when Plaintiff started seeing Dr. Kung who was associated with the day program for substance abuse treatment and his mental disorder which Plaintiff attended three time a week.  (R. 82-83, 92).  Plaintiff's responses to the ALJ's inquiries regarding Plaintiff's compliance with his prescription medications revealed Plaintiff may not always take his medications as prescribed and frequently skipped doses.  (R. 84-88).  The ALJ elicited testimony from Plaintiff confirming that following the earlier administrative hearing, Plaintiff had relapsed into abusing drugs and alcohol, but had not used drugs or alcohol for the previous sixth months.  (R. 89-93).

In response to the ALJ's further questioning, Plaintiff stated six months earlier he had sniffed glue and used marijuana and was consuming a 12-pack of beer every other day.  (R. 89-90).  The ALJ then reminded Plaintiff that at the earlier hearing on May 11, 1997, Plaintiff had testified that he only drank occasionally, including a "few beers" over the Christmas holiday, and inquired as to when Plaintiff had resumed drinking a 12-pack of beer every other day.  (R.91).  Plaintiff responded that he resumed drinking "[a]fter Christmas."  (R. 91).  The ALJ then questioned whether Plaintiff was under treatment for alcohol or drugs, to which Plaintiff responded that his day treatment

program included treatment for substance abuse, causing the ALJ to inquire as why, if

Plaintiff was not currently abusing drugs and alcohol, was he receiving treatment for

substance abuse.  (R. 91-92).  Plaintiff explained that he received treatment for his

mental issues, as well as his substance abuse problem to help prevent Plaintiff from

relapsing into drug and alcohol abuse.  (R. 92).  The ALJ then questioned "[w]ell, if you

are, are concerned about relapsing, how could you tell me at the last hearing that drugs

and alcohol - - you didn't consider it to be a problem?"  (R. 92).  Plaintiff responded that

as of the date of the last administrative hearing, he did not consider drugs and alcohol

to be a problem, to which the ALJ voiced incredulity that Plaintiff would have testified on

May 11, 1997 that he had not used drugs or alcohol for six months except for a couple

of beers over Christmas, but after Christmas had resumed using marijuana, sniffing

glue and drinking a 12-pack of beer every other day and yet was "clean and dry" of

drugs and alcohol as of May 11, 1997.  (R. 93).

        The ALJ inquired as to what prevented Plaintiff from performing his best work on

a job, assuming Plaintiff took his medication, to which Plaintiff responded that stress on

the job caused his manic and bipolar disorder to "kick in."  (R. 93).  Plaintiff continued

that he would then hear voices and would "end up getting either fired or something else

or arrested.  That's the whole problem.  I lose control.  Sometimes the medication

works, sometimes it doesn't."  (R. 93).  Plaintiff testified his daily routine consisted of

attending his substance abuse and mental health treatment program, watching

television, listening to music, preparing meals, cleaning his apartment, grocery

shopping, and seeing his fiancé twice a week who sometimes treated Plaintiff to dinner.

(R. 94).  Plaintiff belonged to a social club with Mid-Erie that sometime went on outings

and bowling.  (R. 95).  Plaintiff testified he heard voices on a daily basis that told him

not to attend his day program and to hurt himself.  (R. 96).  According to Plaintiff, he

has heard the voices since he was eleven years old but he did not tell anyone about the

voices until they "forced" Plaintiff to do things he did not want to do, including hurting his

fiancé and overdosing on medication.  (R. 96).

Kathleen Traina next questioned Plaintiff, asking whether Plaintiff still heard

voices when he was fully compliant with his prescription medication.  (R. 99).  Plaintiff

explained that he would still hear voices, although not as frequently, estimating once or

twice a day, and that the voices were more subdued and he could ignore them.  (R. 99).

Plaintiff further testified that Dr. Kung had assured him that Plaintiff's continued

compliance with his medication would eventually make the voices go away.  (R. 99).

Dr. Mitchell testified as a medical expert from whom the ALJ hoped to obtain

information as to the nature and severity of limitations, if any, arising from Plaintiff's

bipolar and personalities disorders which would remain if Plaintiff ceased his substance

abuse.  (R. 103).  Dr. Mitchell agreed that Plaintiff has a bipolar disorder and a

personality disorder, as well as a substance abuse disorder.  (R. 103-04).  Repeated

questions the ALJ posed to Dr. Mitchell were designed to separate what limitations and

restrictions were properly attributed to Plaintiff's substance abuse from those properly

attributed to Plaintiff's bipolar and personality disorders and which would remain absent

Plaintiff's substance abuse.  (R. 104-132).

After the ALJ finished his questioning Kathleen Traina asked Dr. Mitchell, "[c]ould

you find that with a diagnosis of bipolar disorder, personality disorder, that behaviors

such as non-compliance with treatment recommendations, and I'll include relapses in

DAA [drug and alcohol abuse] are in fact part of the disease.  Things over which the claimant has no control."  (R. 134).  Dr. Mitchell answered, "[t]his is part of the disease process.  Bipolar patients notoriously - - when they feel better, they do more for a while.  Their judgment is of such a nature that they stop taking their medication, and this is sort of common."  (R. 134).  The administrative hearing then concluded.  (R. 134).

In denying Plaintiff's application for benefits on December 8, 2000, following the second administrative hearing, ALJ Mazzarella determined that Plaintiff has not, since the alleged onset of his disability on September 30, 1992, engaged in substantial gainful activity and suffers from a severe impairment within the Act's definition of impairment, but that if Plaintiff ceased abusing alcohol and drugs and fully complied with his "prescribed treatment," Plaintiff would have the residual functional capacity to perform all unskilled work at all levels of exertion except for work requiring more than brief and superficial contact with the general public, closely working with supervisors, or understanding, remembering and carrying out varied and complex tasks, or exposing Plaintiff to more than low-level stress.  (R. 20-21).  The Commissioner also determined that the majority of Plaintiff's episodes of decompensation are precipitated by alcohol and drug abuse (R. 17 (referencing R. 364)), and that Plaintiff's subjective allegations regarding his limitations are not fully credible.  (R. 20).  As such, Plaintiff was found not disabled, as defined in the Act, at any time through December 31, 1997, the last date Plaintiff met the disability insured status requirements, or through the date of the Commissioner's decision. (R. 20-21).

## DISCUSSION

### Disability Determination Under the Social Security Act

An individual is entitled to disability insurance benefits under the Social Security

Act if the individual is unable

> . . . to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months....  An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.

42 U.S.C. §§ 423(d)(1)(A) & 423(d)(2)(A), and 1382c(a)(3)(A) & 1382c(a)(3)(C)(i).

Once the claimant proves that he is severely impaired and is unable to perform any

past relevant work, the burden shifts to the Commissioner to prove that there is

alternative employment in the national economy suitable to the claimant.  *Parker v.

Harris*, 626 F.2d 225, 231 (2d Cir. 1980).  "In assessing disability, the [Commissioner]

must make a thorough inquiry into the claimant's condition and must be mindful that

'the Social Security Act is a remedial statute, to be broadly construed and liberally

applied.'"  *Monguer v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (quoting *Gold v.

Sec'y of H.E.W.*, 463 F.2d 38, 41 (2d Cir. 1972)).

The standard of review for courts reviewing administrative findings regarding

disability benefits, 42 U.S.C. §§ 401-34 and 1381-85, is whether the administrative law

judge's findings are supported by substantial evidence.  *Richardson v. Perales*, 402

U.S. 389, 401 (1971).  Substantial evidence requires enough evidence that a

reasonable person would "accept as adequate to support a conclusion."  *Consolidated

*Edison Co. v. National Labor Relations Board*, 305 U.S. 197, 229 (1938).

When the Commissioner is evaluating a claim, the Commissioner must consider "objective medical facts, diagnoses or medical opinions based on these facts, subjective evidence of pain or disability (testified to by the claimant and others), and . . . educational background, age and work experience." *Dumas v. Schweiker*, 712 F.2d 1545, 1550 (2d Cir. 1983) (quoting *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981)).  If the opinion of the treating physician is supported by medically acceptable techniques and results from frequent examinations, and the opinion supports the administrative record, the treating physician's opinion will be given controlling weight.[6]  *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993); 20 C.F.R. § 404.1527(d); 20 C.F.R. § 416.927(d).  The Commissioner's final determination will be affirmed, absent legal error, if it is supported by substantial evidence.  *Dumas v. Schweiker, supra*, at 1550; 42 U.S.C. § 405(g); 42 U.S.C. § 1383(c)(3).  "Congress has instructed . . . that the factual findings of the [Commissioner],[7] if supported by substantial evidence, shall be conclusive."  *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

The federal regulations set forth a five-step inquiry by which the Commissioner evaluates a claim for disability insurance benefits.  20 C.F.R. §§ 404.1520, 416.920.  *See Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (citing *Perez v. Chater*, 77 F.3d 41,

---

[6] The treating physician's opinion is given greater weight because of the "continuity of treatment he provides and the doctor/patient relationship he develops place him in a unique position to make a complete and accurate diagnosis of his patient." *Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983).

[7] Pursuant to § 106 of the Social Security Independence and Program Improvements Act of 1994, the function of the Secretary of Health and Human Services in Social Security cases was transferred to the Commissioner of Social Security, effective March 31, 1995.  In accordance with § 106(d) of that Act, references to "the Secretary" have been replaced with "the Commissioner."

46 (2d Cir. 1996)).

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed.  If the claimant is not employed, the [Commissioner] then determines whether the claimant has a 'severe impairment' that limits her capacity to work.  If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations.  When the claimant has such an impairment, the [Commissioner] will find the claimant disabled.  However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform [his] past relevant work.  Finally, if the claimant is unable to perform [his] past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work.  If the claimant satisfies [his] burden of proving the requirements in the first four steps, the burden shifts to the [Commissioner] to prove in the fifth step that the claimant is capable of working.

*Brown*, *supra*, at 62 (quoting *Perez*, *supra*, at 46).

In reviewing the administrative finding, the court must follow this five-step analysis to

determine if there was substantial evidence on which the Commissioner based her

decision.  *Richardson v. Perales*, 402 U.S. 389 (1971).

In the instant action, it is undisputed that Plaintiff is not presently employed, nor

has Plaintiff worked since 1992.  (R. 184-89).  Nor do the parties dispute that Plaintiff's

combined medical findings meet the criteria for disability under §§ 12.09 (substance

abuse disorders), based on Plaintiff's bipolar disorder, which meets the disability criteria

under § 12.04 (affective disorders, including manic, depressive and bipolar disorders),

and under § 12.08 (personality disorders).  Nevertheless, the parties dispute the ALJ's

determination that if Plaintiff "were to stop using alcohol and drugs, and became fully

compliant with his prescribed treatment, [Plaintiff's] remaining medical findings would

neither meet nor equal the required criteria of any impairment listed in Appendix 1,

Subpart P, Regulation No. 4."  (R. 20).

The ALJ's determination that Plaintiff, despite meeting the disability establishing criteria under §§ 12.04, 12.08 and 12.09, is not entitled to disability benefits, is premised on 42 U.S.C. §§ 423(d)(2)(C) and 1382c(a)(3)(J), which provide that a claimant found to be "disabled" according to the above five-step inquiry will not be considered disabled within the meaning of the Act "if alcoholism or drug addiction would (but for this subparagraph), be a contributing factor material to the Commissioner's determination that the individual is disabled." *See also* 20 C.F.R. §§ 404.1535(a) ("If we find that you are disabled and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability."), and 416.935(a) (same). The 'key factor' in determining whether alcoholism or drug addiction is contributing factor material to the determination of disability is whether the claimant would still meet the definition of disabled under the Act if he stopped using alcohol or drugs.  20 C.F.R. §§ 404.1535(b)(1), and 416.935(b)(1)).  If it is determined that claimant's remaining limitations would not be disabling, the claimant's drug addiction or alcoholism will be found a contributing factor material to the determination of disability, and benefits will be denied. 20 C.F.R. § 404.1535(b)(2), and 416.935(b)(2).  Where, however, it is determined that the claimant's remaining limitations are disabling, the claimant will be found disabled independent of his drug addiction or alcoholism, such that claimant's drug addiction or alcoholism is not a contributing factor material to the determination of disability, and disability benefits will be granted. 20 C.F.R. §§ 404.1535(c), and 416.935(c).  Furthermore, when the record shows substance abuse, it is the claimant's burden prove that substance abuse is not a contributing factor material to the disability

determination.  *Eltayyeb v. Barnhart*, 2003 WL 22888801, * 4 (S.D.N.Y. Dec. 8, 2003)

(citing *Ball v. Massanari*, 254 F.3d 817, 821 (9th Cir. 2001); *Doughty v. Apfel*, 245 F.3d

1274, 1281 (11th Cir. 2001); *Mittlestedt v. Apfel*, 204 F.3d 847, 852 (8th Cir. 2000); and

*Brown v. Apfel*, 192 F.3d 492, 498 (5th Cir. 1999)).

Significantly, in remanding the matter to the ALJ for a second hearing, the

Appeals Council specifically advised the ALJ that additional information was needed to

determine the nature and severity of limitations arising from Plaintiff's personality and

bipolar disorders which would remain absent Plaintiff's drug and alcohol abuse.  (R.

347-49).  Accordingly, the ALJ obtained testimony from Dr. Nelli Mitchell, a psychiatrist,

in an attempt to separate which of Plaintiff's vocational limitations could be attributed to

his substance abuse, and which would remain if Plaintiff ceased abusing drugs and

alcohol.  The ALJ observed that Plaintiff's treating psychiatrist, Dr. Kung, "could not

disentangle drugs and alcohol [abuse] from Plaintiff's other mental impairments," but

that Dr. Mitchell "was able to do so after careful review of the medical evidence in its

entirety."  (R. 17).

Plaintiff maintains that at the second administrative hearing, the ALJ erroneously

elicited vocational testimony from the medical expert, Plaintiff's Memorandum at 9-11,

erroneously determined that Plaintiff's abuse of drugs and alcohol was a contributing

factor material to his disabling condition, *id.* at 11-12, and erroneously found that the

medical expert was able to separate the limitations from Plaintiff's drug and alcohol

abuse from his bipolar and personality disorders, *id.* 12-13.  The court, however, will not

address Plaintiff's first argument that the ALJ improperly elicited vocational testimony

from the medical expert because the record establishes that the ALJ erred in finding

that the medical expert, Dr. Mitchell, was able to determine Plaintiff's work limitations

caused by Plaintiff's drug abuse from the work limitations that would remain based on

Plaintiff's bipolar and personality disorders if Plaintiff ceased all substance abuse.  The

ALJ, by relying on such erroneous finding, rather than on the opinion of Plaintiff's

treating psychiatrist, violated the treating physician's rule.  Furthermore, the ALJ failed

to consider whether Plaintiff's bipolar and personality disorders constituted a good

reason for Plaintiff's failure to remain fully compliant with prescribed treatment for his

substance abuse disorder, as well as his bipolar and personality disorders.

In the instant case, the ALJ's determination that Dr. Mitchell was able to

"disentangle" the effects of Plaintiff's substance abuse from the effects of Plaintiff's

other mental impairments, and that Plaintiff's was able to work at a low-stress, unskilled

job is not supported by the record and violates the treating physician rule.  Generally,

the Secretary grants the opinion of a treating physician controlling weight only if the

opinion is well-supported by medically acceptable clinical and laboratory diagnostic

techniques and not inconsistent with other substantial evidence.[8]  *Schisler v. Sullivan*, 3

F.3d 563, 567 (2d Cir. 1993); 20 C.F.R. § 404.1527(d).  The ALJ is required to give

controlling weight to a "treating source's opinion on the issues(s) of the nature and

severity of your impairment(s)" if it is "well-supported by medically acceptable clinical

and laboratory diagnostic techniques, and in not inconsistent with the other substantial

evidence," 20 C.F.R. § 1527(d)(2), and provided the treating source's opinion is "a

---

[8]  Deference is given to the opinions of treating physicians based on the belief that opinions formed as the result of an ongoing physician-patient relationship are more reliable than opinions based solely on examination for the purposes of disability proceedings.  *See Schisler v. Sullivan*, *supra*, at 568.

medical opinion under this provision's controlling weight rule." *Diaz v. Shalala*, 59 F.3d 307, 313 (2d Cir. 1995).  As relevant, 20 C.F.R. § 404.1527(c)(1) defines "medical sources," as relevant to the instant case, as including only licensed physicians and licensed or certified psychologists.  20 C.F.R. § 404.1513(a)(1) and (2).  Furthermore, the ALJ "cannot arbitrarily substitute his own judgment for competent medical opinion." *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

Here, Plaintiff's treating psychiatrist, Dr. Kung, reported on September 11, 2000, a little less than two months prior to the second administrative hearing on November 9, 2000, that he was unable "to disentangle the restrictions and limitations imposed by [Plaintiff's] history of alcohol/substance abuse from those resulting from his other impairments.  (R. 413).  Dr. Kung's statement that he was unable to separate the limitations posed by Plaintiff's substance abuse from those posed by his other mental impairments is significant because an internal memorandum from the SSA regarding drug and alcohol abuse disorder ("DAA") provides that

> [w]hen it is not possible to separate mental restrictions and limitations imposed by the DAA and the various mental disorders shown by the evidence, a finding of "not material" would be appropriate.

SSA Emergency Teletype, "Questions and Answers Concerning DAA from July 2, 1996 Teleconference - - Medical Adjudicators - - ACTIONS," August 30, 1996, Answer 29 ("the Emergency Teletype").

Although the Second Circuit has not addressed whether such a teletype issued by the SSA is binding on courts, one district court within the Second Circuit has remarked with regard to the Emergency Teletype that "it represents the sound judgment of the Agency [the SSA] and would be persuasive in that respect."  *Ostrowski v. Barnhart*, 2003 WL 22439585, * 4 (D.Conn. Oct. 10, 2003).

In the instant case, despite Dr. Kung's opinion that the mental restrictions and limitations posed by Plaintiff's substance abuse could not be separated from the mental restrictions and limitations posed by Plaintiff's bipolar and personality disorders, the ALJ determined that Dr. Mitchell, the medical expert who testified at Plaintiff's second administrative hearing, "was able to do so after careful review of the medical evidence in its entirety."  (R. 17).  According to the ALJ, Dr. Mitchell

> described only mild functional limitations remaining if [Plaintiff] were to stop using alcohol and fully comply with prescribed psychiatric treatment.  She testified that his bipolar cycles would be less intense and less frequent; that he would be able to do simple tasks and should be able to function at a low stress level job.  She further opined that the claimant should be able to perform his past occupation of a building maintenance man, as that job does not require close cooperation with other employees or supervisors, and involves only simple repetitive and routine tasks.

(R. 17-18).

This finding, however, is not supported by a thorough review of Dr. Mitchell's hearing testimony.

In particular, in response to the ALJ's question whether Dr. Mitchell were able to "subtract out" the limitations caused by Plaintiff's alcohol and drug abuse from the limitations cause by his bipolar and personality disorders, Dr. Mitchell responded that she was "not clear from the information available in the record whether there is still any alcohol and substance abuse."  (R. 104).  The ALJ then asked whether Dr. Mitchell would consider Plaintiff's consumption of a 12-pack of beer every other day, glue sniffing and marijuana use to be substance abuse and Dr. Mitchell responded it would that such use would contribute to Plaintiff's limitations by interfering with treatment of his underlining bipolar and personality disorders.  (R. 104-05).

The ALJ then asked whether Plaintiff, if compliant with his medications, and abstaining from drugs and alcohol, would have any limitations as to his activities of daily living, and Dr. Mitchell responded that Plaintiff would, especially emotional lability which Plaintiff "already shows," and that the record establishes Plaintiff "cycles" from manic to mild depressive state. (R. 106). The ALJ then asked whether Plaintiff would "be leveled out" upon fully complying with his lithium prescription, and Dr. Mitchell replied "[h]e might be," explaining that Plaintiff would be expected to have fewer cycles, which would be an improvement, but also pointed out that Plaintiff is not able to fully care for himself as evidence by the fact that he is unable to pay his own bills. (R. 106-07). Dr. Mitchell explained that Plaintiff would also have social functioning limitations, including his tendency to wander and seek attention, even on his good days. (R. 107). When asked whether Plaintiff was capable of working with others, Dr. Mitchell responded "[h]e might at times, but it would not be consistent," explaining that Plaintiff is known to become argumentative and to have problems with supervision. (R. 108).

The ALJ then questioned whether, if Plaintiff both abstained from drugs and alcohol and was compliant with medication, there would be any interference with Plaintiff's ability to comprehend and attend to work, and Dr. Mitchell responded that the nature of Plaintiff's illness would still pose difficulty in those areas. (R. 109). Dr. Mitchell further testified that even with full compliance with treatment, Plaintiff could still be expected to have episodes of decompensation triggered by stress. (R. 109). As such, the ALJ then queried as to whether some occupations were less stressful than others, and whether Plaintiff could be expected to be able to work at a low stress job, such as a dishwasher. (R. 109-10). Dr. Mitchell responded that although a

dishwashing job may generally be considered low stress, depending on the individual

and the actual job, including whether the supervisor was overly critical, Plaintiff may not

be able to perform the job.  (R. 111).  The ALJ questioned whether, assuming Plaintiff

were compliant with treatment and abstained from drugs and alcohol, Plaintiff could

perform a low-stress job that did not involved a great deal of supervision or close

involvement with other people, and Dr. Mitchell responded that even if Plaintiff could

perform the job, there was still a question as to Plaintiff's ability to consistently show up

for work.  (R. 112-13).  Dr. Mitchell explained that although some people with bipolar

disorders are capable of working, "the problem is that something usually precipitates

them decompensating so that they do have the ups and downs and unfortunately

sometimes, are not consistently able to maintain themselves in a job situation.  So that

they are either fired or otherwise."  (R. 113).

The ALJ then stated that "in this case, the decompensation appears to be

precipitated by non-compliance * * * * If this individual was compliant, would you expect

them to be able to get to and from work?"  (R. 113).  Dr. Mitchell replied "[i]t would be

highly questionable whether this person would get consistently to work.  See we're

talking about bipolar part of it, but we have not talked about the combination with the

personality - - the things that you have.  So, with this personality disorder, he may or

may not get to work.  So that you have this inconsistency there even though he was

taking his medication."  (R. 113).  The ALJ asked "[s]o, he's unemployable even though

he has taken his medication and doesn't drink and doesn't use drugs?"  (R. 114).  Dr.

Mitchell replied "I would question how consistently he could remain employed.  I think

there would be decompensation. * * * * Not showing up, not feeling good.  Not - -

reportedly hearing voices." (R. 114).  The ALJ attempted to clarify that Dr. Mitchell's opinion was that Plaintiff *could not* work, but Dr. Mitchell clarified that it was her opinion that Plaintiff *would not* work.  (R. 114).  (*See also* R. 116 (ALJ asking "[a]re you saying that even though stable psychologically, he shouldn't be - - he can't work?" and Dr. Mitchell responding "I'm saying that he would not be consistent - - be expected to consistently attend. . . ." and that such inconsistency would likely cause an employer to not be able to count on him and let him go.)).

Dr. Mitchell pointed to Dr. Kung's inability to separate the limitations posed by Plaintiff's alcohol and substance abuse from those posed by his mental illness, stating that she also was unable to do so and that, even excluding Plaintiff's substance abuse, "[i]ndividuals with the problem of bipolar disorder unfortunately are not always consistent in terms of anything.  They do have their little fluctuations.  They may be able to be maintain[ed] in a job situation, but in a higher functioning job situation, they probably would not be maintained." (R. 116-17).  Dr. Mitchell stated she was unable to quantify  how often Plaintiff could be expected to miss work, even though compliant with treatment and absent any substance abuse.  (R. 117).  Dr. Mitchell further pointed to the fact that Plaintiff continues to hallucinate on a daily basis, even when compliant with his treatment.  (R. 118-19).  When questioned further, Dr. Mitchell testified that Plaintiff's expected inconsistency in attending work would be a function of the disease process rather than based on Plaintiff's decision not to go to work, and explained that most bipolar people, even when properly taking their medication, can still be expected to have "swings" that interfered with their ability to work.  (R. 122-23).

The ALJ asked whether, if Plaintiff complied with his treatment and abstained

from all substance abuse, it could be expected that Plaintiff would be psychologically

stable, and Dr. Mitchell replied that although "psychologically stable" would indicate that

Plaintiff were better socially, Plaintiff still did a lot of roaming, sought attention and

posed problems with group situations. (R. 126-27).  The ALJ then pointed to the record

as indicating that when Plaintiff is compliant, he is able to perform simple tasks with

little or no staff intervention, but Dr. Mitchell responded that although in such situation

Plaintiff could be expected to perform a simple task, it would only be for a limited time,

and that it would be a "different story" if Plaintiff were expected to perform the task for

an extended period of time such as on a regular workday basis.  (R. 127-28).

     In short, Dr. Mitchell's testimony does not establish that Dr. Mitchell herself was

ever able to separate the limitations and restrictions posed by Plaintiff's substance

abuse from the limitations and restriction posed by Plaintiff's bipolar and personality

disorders and which would remain if Plaintiff ceased all substance abuse.  Rather, Dr.

Mitchell merely responded to the ALJ's repeated hypothetical assumptions regarding

which limitations and restrictions posed by Plaintiff's bipolar and personality disorders

which would remain if Plaintiff ceased all substance abuse.  As such, Dr. Mitchell's

testimony provides no basis on which the ALJ could rely in determining whether

Plaintiff's substance abuse is a contributing factor material to his disability

determination.  Under these circumstances, a finding that Plaintiff's substance abuse is

not a contributing factor to his disability is required.  The Emergency Teletype.

     Moreover, even if Dr. Mitchell were able to separate the limitations and

restrictions posed by Plaintiff's substance abuse from the limitations and restrictions

that would remain absent substance abuse and based on Plaintiff's bipolar and

personality disorders, Dr. Mitchell also repeatedly testified that if Plaintiff fully complied with his treatment and abstained from all alcohol and drug abuse, Plaintiff still would suffer from bipolar and personality disorders, the symptoms of which would prevent Plaintiff from being able to consistently perform even a low stress, unskilled job.  This is consistent with Dr. Kung's opinion of November 15, 1999 that Plaintiff "does not appear to be able to engage in sustained work activity due to his Bipolar [disorder]."  (R. 373).

Nor do the ALJ's findings that Plaintiff's limitations and restrictions are improved when Plaintiff fully complies with his prescribed treatment and abstains from all substance abuse and that "the majority of [Plaintiff's] decompensations are precipitated by alcohol and substance abuse," (R. 17), support the ALJ's conclusion that substance abuse is a contributing factor material to the determination as to whether Plaintiff is disabled.  Significantly, the ALJ never indicated which of Plaintiff's impairments would remain if Plaintiffs abstained from all substance abuse.  Rather, the ALJ merely characterizes Plaintiff's limitations as "far less marked" when Plaintiff abstains from drugs and alcohol.  See *Frederick v. Barnhart*, 317 F.Supp.2d 286, 293 (W.D.N.Y. 2004) (holding ALJ statement claimant's mental functional limitations would "significantly improve" if she stopped using alcohol was not requisite determination as to which of claimant's psychological impairments would exist independently of her alcohol abuse and whether such impairment was disabling).  "A finding that there would be *improvement* in [Plaintiff's] symptoms is not dispositive of whether [Plaintiff's substance abuse] is material to [his] disability.  *Frederick*, *supra*, at 293 (italics in original).  Similarly, that the majority of Plaintiff's decompensations have been precipitated by substance abuse does not undermine the fact that the record establishes that Plaintiff

suffers from bipolar and personality disorders that exist apart from his substance abuse. *Frederick*, *supra*, at 295-96.  Rather, the link between Plaintiff's substance abuse and decompensations establishes only that drug and alcohol abuse tend to exacerbate Plaintiff's bipolar and personality disorders.  *Id*. at 296.  Notably, the record contains evidence that Plaintiff had episodes of decompensation that were not precipitated by substance abuse, including his November 15, 1999 psychiatric hospitalization which Plaintiff's counselor, Frank, reported "was initiated by the break-up of a personal relationship."  (R. 366).

Nor does the fact that Plaintiff often failed to fully comply with his prescribed treatment require a finding of "not disabled."  Compliance with prescribed treatment that is capable of restoring a plaintiff's ability to work is required to obtain benefits, unless there is a good reason for not following prescribed treatment.  20 C.F.R. §§ 404.1530, 416.930.  "[T]he ALJ has an obligation to take the claimant's mental limitations into account in determining whether such a failure truly reflects an improvement in his condition.  20 C.F.R. §§ 404.1530(c).  Courts considering whether a good reason supports a claimant's failure to comply with prescribed treatment have recognized that psychological and emotional difficulties may deprive a claimant of "the rationality to decide whether to continue treatment or medication."  *See*, *e.g.*, *Thompson v. Apfel*, 1998 WL 720676, *6 (S.D.N.Y. Oct. 9, 1998) (holding ALJ erred in failing to consider whether claimant's psychological and emotional difficulties deprived claimant of the rationality to decide whether to continue treatment or medication).  *See also Zeitz v. Secretary of Health and Human Services*, 726 F.Supp. 343, 349 (D. Mass. 1989) (recognizing claimant's agoraphobia, a psychosomatic anxiety-related disorder, "may

defy any generally prescribed treatment requiring the will of the individual claimant to recover," such that claimant's failure to follow prescribed treatment, including taking prescribed medications and attending group therapy sessions, did not render claimant ineligible for disability benefits).

In the instant case, it is significant that the ALJ never questioned the medical expert as to whether Plaintiff's failure to fully comply with his prescription medication requirements was at all attributed to the nature of Plaintiff's bipolar disorder or personality disorder.  Rather, that issue was raised only by Plaintiff's representative, Kathleen Traina, who, at the end of the second administrative hearing, asked Dr. Mitchell, "[c]ould you find that with a diagnosis of bipolar disorder, personality disorder, that behaviors such as non-compliance with treatment recommendations, and I'll include relapses in DAA [drug and alcohol abuse] are in fact part of the disease. Things over which the claimant has no control."  (R. 134).  Dr. Mitchell answered, "[t]his is part of the disease process.  Bipolar patients notoriously - - when they feel better, they do more for a while.  Their judgment is of such a nature that they stop taking their medication, and this is sort of common."  (R. 134).

The ALJ failed to comment on Dr. Mitchell's opinion.  Moreover, Dr. Mitchell's response to Traina's question is consistent with other evidence in the record regarding Plaintiff's impaired judgment and lack of insight.  (*See*, *e.g.*, R. 260 (Dr. Tjoa opining Plaintiff has poor impulse control), R. 367 (Dr. Kung rating Plaintiff's ability to use judgment was "fair"), and R. 372 (Dr. Kung describing Plaintiff's insight into his negative behavior as "very poor")).

Based on the record before the court, Plaintiff has established that his disabling

mental impairments, including a bipolar disorder and a personality disorder, would continue and would meet the criteria necessary to establish disability under §§ 12.04 (affective disorders) and 12.08 (personality disorders).  As such, a remand for further development of the record would serve no purpose.  Therefore, the Commissioner's decision is vacated, and the matter is remanded solely for calculation of benefits.


## CONCLUSION

Based on the foregoing, Defendant's motion for judgment on the pleadings (Doc. No. 11) is DENIED; Plaintiff's cross-motion for judgment on the pleadings (Doc. No. 14) is GRANTED, and the matter is remanded for calculation and payment of benefits.  The Clerk of the Court is directed to close the file.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE


DATED:        November 22, 2005
             Buffalo, New York